IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA,          )
                                   )
                    Plaintiff,     )
                                   )
v.                                 )          No. 3:11-CR-142
                                   )
UNDRA DAVIS,                       )          (VARLAN/SHIRLEY)
                                   )
                    Defendant.     )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate. This case is before the Court on the Defendant's Motion to Suppress [Doc.

34], filed on January 30, 2012. The Government responded [Doc. 19][1] in opposition to the motion

on January 9, 2012. The Court held an evidentiary hearing on February 2, 2012. Assistant United

States Attorney Alexandra Hui represented the Government. Attorney Stephen G. McGrath appeared

on behalf of the Defendant, who was also present. The Government presented the testimony of Oak

Ridge City Police Department Officers Jeremy Huddleston and John Thomas. The parties also

presented oral argument on the issues. At the conclusion of the hearing, the Court granted the

Defendant's request for leave to file a post-hearing brief. The Defendant filed his post-hearing brief

---

[1]The Government initially responded to the Motion to Suppress [Doc. 17] filed by
the Defendant's previous counsel, which the Court permitted the Defendant to withdraw
[Doc. 36] and replace with new counsel's amended Motion to Suppress [Doc. 34], at issue
in this Report and Recommendation. The Government represented to the Court [Doc. 35]
that the Defendant's second motion to suppress appeared substantially similar to the first
and that it relies on its earlier response [Doc. 19] in opposition to the instant motion.

[Doc. 40] on February 9, 2012. The Government filed its responsive post-hearing brief [Doc. 41] on February 15, 2012. The Court took the motion, response, testimony, exhibits, post-hearing briefs, and oral arguments under advisement.

## I. POSITIONS OF THE PARTIES

The Defendant is charged in a four-count Indictment [Doc. 7] with possessing with intent to distribute twenty-eight or more grams of crack cocaine, possessing with intent to distribute a quantity of cocaine, being a felon in possession of a firearm, and possessing firearms in furtherance of drug trafficking, all on or about November 12, 2011. The Defendant argues that all evidence discovered and seized should be suppressed because he was illegally stopped and seized without reasonable suspicion or probable cause. The Defendant also claims that the improperly seized evidence found in his home provided the basis for two search warrants issued and that any items seized in the searches authorized by the warrants should thus be suppressed as fruits of the poisonous tree. The Government responds that the law enforcement officers had probable cause to arrest the Defendant and that the officers' entry into the Defendant's house was lawful.

## II. SUMMARY OF EVIDENCE FROM SUPPRESSION HEARING

*(A) Testimony of Officer Jeremy Huddleston*

The Government called Officer Jeremy Huddleston, who testified that he works as a police officer for the Oak Ridge City Police Department, patrolling high crime areas and investigating crimes and accidents within the city limits of Oak Ridge, Tennessee. In addition to testifying about his other training and experience as a police officer, Officer Huddleston testified that he was certified

2

in radar detection in 2007 while working with the Jamestown Police Department. During his radar training, Officer Huddleston was taught how to estimate the speed of a passing vehicle, visually and then through radar confirmation. Officer Huddleston now works as a radar instructor.

Officer Huddleston arrested the Defendant in the early hours of November 12, 2011, and he was familiar with the Defendant prior to that date. Officer Huddleston testified that his familiarity with the Defendant came from police department roll call briefings at the beginning of shift changes, during which the police officers receive updates on recent crimes, persons of interests, high crime areas, and wanted individuals. Officer Huddleston testified that the Defendant had previously been one of the wanted individuals presented during roll call and that his picture had been passed around. Officer Huddleston also testified that he once patrolled Salem Road in Oak Ridge and passed the Defendant's home, seeing him there, and that he had also previously seen the Defendant on Lasalle Road near apartments.

Officer Huddleston described an incident on Robertsville Road in Oak Ridge prior to November 2011, when he saw a speeding automobile. When Officer Huddleston turned to pursue the car, the driver put the car in reverse and did a three-point turn in the road to go the other way, turning down Salem Road. Officer Huddleston lost sight of the car at that point. He did not see who was driving the car that evaded him, but he believed that it was the Defendant because he had seen a description of that car as "one that [the Defendant] used to drive" during roll call [Doc. 39 at 13].

Officer Huddleston testified that prior to patrolling, he often conducts searches through local police records to find the addresses of individuals with warrants out for their arrests and looks into their descriptions and prior records for safety in case he ends of dealing with them. Officer Huddleston also testified that he has access to the Anderson County Sheriff's Department website

3

and that he looks at booking photos and the active warrant list. The officer stated that he has previously seen the Defendant's Anderson County booking photo during such preparation and that he was familiar with both the Defendant's appearance and his criminal history prior to November 12, 2011.

On November 12, 2011, at approximately 3:30 a.m., Officer Huddleston was conducting a basic patrol in a marked police cruiser and was in a residential area on Ivanhoe Road in Oak Ridge, driving toward a four-lane state highway, North Illinois Avenue. When Officer Huddleston drove up to the intersection at Ivanhoe Road and North Illinois Avenue and was coming to a stop, he observed a newer model black SUV "traveling at a high rate of speed" driving down North Illinois Avenue in front of him [Doc. 39 at 14]. Based on his training, Officer Huddleston estimated that the SUV was moving at approximately sixty to sixty-five miles per hour, on a road with a posted speed limit of forty miles per hour.

Officer Huddleston testified that when the SUV drove by him, he could see two black males inside. He testified that he could not get a good look at the passenger because he was leaned back in the passenger seat. Officer Huddleston stated that he made eye contact with the driver and that the he could "actually see" the driver [Id. at 15]. The officer testified that the driver looked over at the officer to the driver's right side and that he had both hands on the steering wheel and was pulling himself up toward the wheel. Officer Huddleston testified that the driver was wearing a black flat-billed baseball cap and that he had a "look of just shock on his face, or what I thought was shock" as he drove by [Id.]. Officer Huddleston testified that the passenger's body did not block his view of the driver because the passenger's seat was leaned back far. The SUV had no window tint, and Officer Huddleston claimed that he could see the two people inside of the SUV because his

4

headlights were on and facing the car's direction and were shining into the car. He also testified that there were street lights "out" and that the road is a major highway, so "[i]t's well lit" Doc. 39 at 16].

Officer Huddleston testified that he recognized the driver's face and thought he had seen him before but that he could not remember his name. The officer related that he saw the driver of the SUV slammed on its brakes, with the brake lights coming on and the front of the car dipping down some. After witnessing that, Officer Huddleston turned onto the North Illinois Avenue behind the SUV, and the SUV sped up again. Officer Huddleston then clocked the SUV's rate of speed on his mobile radar and confirmed that it was traveling at fifty-eight miles per hour. Officer Huddleston attempted to conduct a traffic stop at that point, turning on his blue lights and siren, and he sped up to attempt to catch the SUV as it started traveling faster. Officer Huddleston believed that the SUV was "actively evading" him as it continued to speed up [Doc. 39 at 17]. When the officer determined that the SUV was actively evading him, he had to terminate his pursuit pursuant to the Oak Ridge City Police Department policies and procedures. He noted that the SUV turned onto Iroquois Road. At the hearing, Officer Huddleston then identified a map of the roads in the area [Exhibit 1 to Feb. 2, 2012 hearing].

Officer Huddleston testified that while he was unable to determine the make and model of the SUV while he was in pursuit because he was not familiar with the type it was, he did get a good look at it to recognize it at a later time. After ceasing to follow the SUV, Officer Huddleston used his police radio to inform the other officers what happened and advised the them that there was a black SUV that had turned down Iroquois Road with two black males inside. He also informed the officers on the radio that the SUV had just fled from him. Officer Chris Carden then advised over the radio that he had seen the SUV driving fast on Robertsville Road. At that point, Officer

5

Huddleston's sergeant, Sergeant Peter Nance, got on the radio and "said oftentimes vehicles that run from us end up on Salem Road," which is south of Robertsville [Doc. 39 at 21]. Officer Huddleston testified that Salem Road and Robertsville Road intersect going west down Robertsville, and Officer Carden had observed the SUV heading that direction. Portions of the radio traffic from Officer Huddleston's cruiser were then played for the Court [Exhibit 3 to Feb. 2, 2012 hearing]. On the recording, Sergeant Nance states that there is a house in the area on Salem that "Undra Davis" used to stay in. Officer Huddleston testified that at that point in the night, "[i]t was all starting to come together" as to who he had seen in the SUV [Doc. 39 at 25].

When Officer Carden was attempting to catch up to the SUV on Robertsville Road, he stated that the SUV was going over eighty miles per hour on the road, which has a speed limit of twenty-five. After Officer Huddleston heard the information from Sergeant Nance indicating that the SUV may head toward Salem Road, Officer Huddleston proceeded to Salem Road. He believes that it took less than four minutes from the moment when he attempted to initiate the traffic stop with the SUV until when he arrived on Salem Road. Officer Huddleston then identified the relevant roads on another map of the area [Exhibit 2 to Feb. 2, 2012 hearing].

Between when Officer Huddleston lost sight of the SUV after the failed attempt at a traffic stop and the moment he turned onto Salem Road, Officer John Thomas' cruiser got behind him to follow. Officer Huddleston "pretty much" headed to Salem Road on a hunch after hearing the advisement of Sergeant Nance [Doc. 39 at 28]. He did not know if he would find the SUV on the road. When Officer Huddleston, with Officer Thomas driving behind him, arrived at the intersection of Salem Road and South Seneca Road, he saw what he believed to be the same SUV backed into the driveway that connects to Salem Road. Officer Huddleston testified that he knew it was the same

6

SUV that had evaded him because it had the same driver, the Defendant. He testified that he could see the Defendant getting out of the SUV because the cruiser's headlights were shining toward the SUV. Officer Huddleston also testified that the dome light of the SUV came on as the Defendant opened the door and that the Defendant was wearing the same flat-billed hat and made eye contact with the officer again. While Officer Huddleston did not know the make and model of the vehicle, he testified that he knew that the one in the driveway was the "exact same shape, the exact same color, the exact same size" as the SUV that evaded him [Doc. 39 at 29].

Officer Huddleston, in uniform, then proceeded to get out of his cruiser and instructed the Defendant to stop and get on the ground. The Defendant ignored the officer and started to run toward a door at the back of the house. The officer chased him on foot and yelled for him to stop, show his hands, get on the ground, identified himself as a police officer, and told the Defendant that he was under arrest. Officer Huddleston testified that he was "most definitely" concerned for his safety at that point [Id. at 30]. Officer Huddleston stated that he could not see the Defendant's hands when the Defendant made it to the door and that the officer approached behind the Defendant. Officer Huddleston testified that he was blocked by a porch rail which kept him from getting closer to the Defendant. The officer continued to order the Defendant to show his hands, which he testified were around his waistband, where people often carry weapons, and the officer did not know what was in the Defendant's hands.

At the hearing, Officer Huddleston testified further about the time outside of the Defendant's house with the illustration of photographs of the area [Exhibits 4, 5, and 6 to Feb. 2, 2012 hearing]. The officer reiterated that the Defendant was exiting the SUV when he arrived and that the Defendant went straight to the door of the house. He testified that the passenger was also exiting.

7

Officer Huddleston testified that he got out of his cruiser on the driver's side, went around the front of his car, and ran to the deck area where the door to the house was. The officer showed on the photograph [Exhibit 5] that the door the Defendant ran to had a white screen door. When the officer reached the porch, he continued to yell to the Defendant to stop and that he was under arrest. He then warned the Defendant that he was about to tase him if he did not show his hands. Officer Huddleston related that he was chasing the Defendant on foot at this point because he had fled from him in the SUV on North Illinois Avenue. He further testified that he planned to arrest the Defendant for felony evading arrest and also to charge him with speeding.

After the Defendant did not comply with his requests, Officer Huddleston deployed his taser, shooting its two barbs at the Defendant's backside and delivering an electric shock to subdue him. Officer Huddleston stated that he was no more than four feet from the door when he deployed the taser and that he did not attempt to place hands on the Defendant instead of tasing him because it was unsafe given that the screen door was open and blocking a portion of the back porch. If Officer Huddleston would have attempted to go around the rail and get on the porch, he believes that he would have been confined in an enclosed area and would have been stuck in a "fatal funnel" with limited cover and avenues of escape [Doc. 39 at 37].

When the officer deployed his taser, the Defendant "pushed the door open in the house and fell forward" [Id. at 38]. Officer Huddleston testified that the Defendant was still able to move some because tasers do not have a 100 percent success rate, and the officer believes that one of the taser's two barbs did not make good contact because the Defendant was able to take a step into the house. The Defendant then fell into the house and down a flight of stairs that go straight down from the door to the basement. The officer followed the Defendant down the stairs and met him at the bottom,

8

telling him to show his hands and put his hands behind his back, and that he was under arrest.

The Defendant again did not fully comply with the officer's orders at first, which concerned the officer because the Defendant's hands were underneath his body as he laid on his stomach. Officer Huddleston testified that the Defendant was initially "thrashing around" but eventually put his hands behind his back [Doc. 39 at 40]. The officer then put handcuffs on the Defendant and informed him that he was under arrest, and conducted a brief search of the Defendant's person to determine if he had a weapon that he could access in his waistband. Officer Huddleston did not find any weapons at that point, but he found three cell phones, the keys to the Dodge Durango the Defendant had been driving, and about $500 in a wad of cash. Officer Huddleston also discovered that the Defendant had a broken foot in a cast at this point. The Defendant then informed the officer that his foot was hurting, which the officer stated was understandable given his fall. The officer testified that his main concern at that point was to make sure the Defendant was not armed and then to determine if he was injured. Accordingly, after the brief search of the Defendant, the officer called emergency personnel to come and check out the Defendant.

Upon a more thorough search of the Defendant later, Officer Huddleston and Officer Thomas found what appeared to be about a gram of crack in a small clear sandwich bag in the Defendant's jacket pocket, as well as a roll of cash (over $1,900) in the Defendant's shorts under his sweat pants. When searching the area immediately within the Defendant's reach, Officer Huddleston found a "cookie shape" in a clear bag that appeared to be crack on the floor about one foot from the Defendant [Doc. 39 at 42].

Officer Thomas also informed Officer Huddleston that he saw items consistent with the manufacture of crack, including microwaves, a dropper, and Dixie cups, and the officers saw two

9

empty pistol holders on a table close to where the Defendant was on the floor. The officers did not seize those items at the time. Some of the other officers told Officer Huddleston that there was a semiautomatic pistol between the unfinished ceiling of the basement area and the foundation wall to the right of the stairs, and Officer Huddleston seized that pistol to secure it for officer safety reasons, and because the officers suspected the Defendant of being a convicted felon. After securing the house, the officers called the Special Projects Unit to obtain a search warrant for the home, and no officers searched until the warrant was obtained.

At the hearing, the cruiser video from Officer Huddleston's car was admitted into evidence [Exhibit 7 to the Feb. 2, 2012 hearing] and played in part for the Court, going through video of the point at which the officer first saw the black SUV and the driver. Officer Huddleston did not recall his exact speed, but he believes he was traveling at least seventy to eighty miles per hour when he was chasing the SUV. During the time between when Officer Huddleston ceased his pursuit of the SUV and when he arrived at the Defendant's residence, he manually turned off the in-car video for approximately two and one half minutes, and he claims that he did so to conserve memory "in case something pertinent" happened later [Doc. 39 at 49]. Through the video illustration of the events, Officer Huddleston testified that he concluded his pursuit of the SUV at approximately 3:34 a.m., and was in the basement of the house at approximately 3:39 a.m. Officer Huddleston did not resume the in-car video recording until he was already in the basement with the Defendant secured. At that point, he did so remotely on his duty belt.

Responding to a question from the Court, the officer testified that the passenger of the SUV ran toward the back of the car when the Defendant got out. Officer John Thomas, a K-9 officer, detained the passenger and waited for backup.

On cross-examination, Officer Huddleston testified that the intersection at Ivanhoe and North Illinois Avenue, where the officer first saw the black SUV, was well-lit as it is a state highway with street lights. He testified that the SUV's windows were up and that he did not notice any tint on the windows. Officer Huddleston admitted that his headlights having faced the SUV could have had a negative impact on his ability to see inside of the car if it caused a glare on the SUV's windows. Officer Huddleston testified that his training allows him to estimate the speeds of cars "very fast," in less than five seconds [Doc. 39 at 54].

Defense counsel reviewed the in-car video [Exhibit 7] from the officer's cruiser with him, and Officer Huddleston stated that the SUV drove by him very fast from when he first saw it to when it was out of his sight. Officer Huddleston testified that a black SUV with two black males inside was the best description that he put out on the radio after witnessing the SUV drive quickly by him. After the SUV turned onto Iroquois and the officer stopped his pursuit, he did not see the SUV or any other black cars until he pulled up to the driveway at the house at the corner of Salem Road and South Senenca. When the officer arrived at the house, he no longer had his emergency lights on, but he had his headlights on. Officer Huddleston testified that when he pulled up to the house, the Defendant was in the SUV, with the door open and the dome light on, and that he got out of the SUV before the officer got out of his cruiser. The officer approximated that the Defendant was probably halfway or three-quarters of the way to the door of his house when the officer got out of his car in pursuit of him. Officer Huddleston testified that the Defendant reached the door on the deck and that the officer stopped on the grass on the other side of the rail from the deck.

When asked about the narrative in his incident report, Officer Huddleston testified that the reason it states that he observed a black Dodge Durango when he was at the intersection of Ivanhoe

and North Illinois, rather than just a black SUV, when he did not in fact know yet that the SUV was a Dodge Durango, is because he was certain that the SUV at the house was the same one that had driven by him earlier. The officer confirmed that no one mentioned a Dodge Durango during the police radio communications and that no officers stated that they had seen the Defendant in the SUV.

While again discussing the Defendant, the officer testified that after he deployed the taser into the Defendant's back, the "door pushe[d] open" and the Defendant fell all of the way down the steps [Doc. 39 at 67]. Officer Huddleston testified that individuals are allowed to refuse to stop and talk with officers if asked on the street to do so.

Officer Huddleston related that the Defendant was known to have been driving a grayish silver Nissan Maxima and that the officer had never known the Defendant to travel in a black SUV or Dodge Durango prior to the date of the arrest.

When questioned briefly by the Court, Officer Huddleston testified that the taser has two barbs like fish hooks and that it has copper wires running from each barb back to the taser device, which remain connected through deployment. In response to followup questions by defense counsel, the officer testified that the wire on his taser the night of the Defendant's arrest was twenty-five feet long. Officer Huddleston testified that when he deployed the taser, his arm was reaching over the rail of the deck and that the Defendant was approximately two to four feet away from the taser. When the officer reached the Defendant at the bottom of the stairs, one of the barbs of the taser was connected around the bottom part of the Defendant's back and the other was "dangling in his jacket," meaning that it probably did not make a good connection [Doc. 39 at 72]. Officer Huddleston testified that the lack of a good connection may be why the Defendant was able to step forward after the barb hit him. The officer did not know where the Defendant's feet were, whether he had a foot

or two inside the doorway of the house, when he deployed the taser.

Again in response to a question from the Court, Officer Huddleston testified that Officer Thomas' cruiser should have pulled up to the house right after him because he had been traveling close behind, but that he did not see the other officer arrive.

### (B) Testimony of Officer John Thomas

Officer John Thomas is a police officer and a certified K-9 handler and trainer with the Oak Ridge City Police Department, and he was also involved in the arrest of the Defendant on November 12, 2011. Officer Thomas was familiar with both the Defendant's appearance and his criminal history prior to the night of his arrest. In 2009, Officer Thomas took part in an Oak Ridge Police Department operation to arrest individuals indicted on drug charges, and the Defendant was one of the individuals under indictment. Through that operation, Officer Thomas reviewed pictured, documents, and information related to the Defendant. Additionally, approximately one and one half months prior to the Defendant's arrest on the instant case, Officer Thomas was evaded by a suspect, and he subsequently charged the Defendant with having been the one evading him.

In the early morning hours of November 12, 2011, Officer Thomas, in uniform, was working a patrol shift in a marked police cruiser. He heard Officer Huddleston on the radio say that a black SUV was fleeing from him on North Illinois Avenue. Where Officer Thomas had been patrolling was close in area to the pursuit being conducted by Officer Huddleston, so he moved into the area. Officer Thomas heard Officer Huddleston relate that the SUV had turned onto Iroquois Road, so he turned onto Robertsville Road to attempt to find the SUV and assist in stopping it. Officer Thomas testified that it is typical for him to move in as backup in such situations. Officers Thomas and Huddleston looked for the SUV for a short time before hearing Officer Carden report that he had

13

seen the SUV traveling west on Robertsville Road. Officers Thomas and Huddleston both headed west toward the path that the SUV had gone. Officer Thomas stated that they planned to start checking areas to search for the SUV and that he had one specific location on Salem Road where he wanted to look.

Officer Thomas stated that he knew from past experience that fleeing cars frequently go to Salem Road. The officer also testified that the sergeant told them that Salem Road was a place they should check. Officer Thomas testified that "in [his] mind the first person who come to mind for someone fleeing the police was [the Defendant]" [Doc 39 at 82]. Officer Thomas stated that he and Officer Huddleston did not have a intended final destination when they proceeded to Salem Road, but that they planned to check that area and then go to another area if they did not find the SUV on Salem. Officer Thomas testified that the officers stopped at 132 South Seneca Road in Oak Ridge, at the intersection of Salem and South Seneca, because Officer Huddleston turned on the blue lights of his cruiser and turned into the driveway at the house. Officer Thomas testified that he heard Officer Huddleston say on the radio that the black SUV and occupants of it from his earlier chase were in the driveway at 132 South Seneca.

Officer Thomas saw Officer Huddleston exit his cruiser and saw a black Dodge Durango backed into the driveway with two men standing near the SUV. Officer Thomas got out of his car to go and assist Officer Huddleston in detaining the men. When Officer Thomas got out, he saw Officer Huddleston chasing a man running toward the house from the driver's side of the SUV, and he heard Officer Huddleston identifying himself as a police officer and yelling for the man to stop. Officer Thomas saw that the passenger of the SUV was heading toward Officer Huddleston and the driver, so he got his K-9 out of the car to protect Officer Huddleston and keep the passenger from

14

coming up behind him.

While approaching the passenger, Officer Thomas lost sight of Officer Huddleston and the driver around the corner of the house, and he heard the taser activate. A short time later, Officer Thomas heard Officer Huddleston state on the radio that he was in the basement of the house. Officer Thomas told the passenger to get down and the passenger complied as other officers started arriving at the house. Officer Thomas told the officers who arrived to head to the basement to assist Officer Huddleston while he detained the passenger. Officer Thomas heard Officer Huddleston call for emergency services to come and treat the Defendant, and after securing the passenger in another officer's cruiser and putting the K-9 back into his own car, Officer Thomas went to the basement.

When Officer Thomas got into the basement, he saw the Defendant at the foot of the steps, handcuffed and seated, with his jacket hanging partially off around his shoulders. Officer Thomas looked around the basement and saw a table with two empty gun holsters on it, a knocked askew couch, a few microwaves, and cups with droppers or stirrers inside. Based on his narcotics and other training, Officer Thomas was concerned when he saw holsters without guns, because be believed that the guns could be inside the house somewhere else and a possible threat. He also believed that the microwaves and cups might be used for the manufacture of crack.

Officers Thomas and Huddleston searched the outer clothing of the Defendant and found a clear capsule with a white powdery residue inside, as well as a sandwich bag with a substance resembling crack, both in a jacket pocket. Officer Thomas testified that while the emergency personnel were treating the Defendant and the officers were speaking with him, one of the emergency personnel pointed to something at the top of a foundation wall by the bottom of the steps. When Officers Carden and Thomas inspected further, they saw that the item was a .45 caliber

15

semiautomatic Ruger. Officer Thomas checked the gun to make sure it was clear and gave it to Officer Huddleston. When the Defendant was heading up the stairs, Officer Thomas searched the area where he had been seated and saw a clear plastic sandwich bag sticking out from underneath the couch, about one foot from where the Defendant was seated. Officer Thomas picked up the bag and believed it had crack inside. Officer Thomas stated that he did not search anywhere in the basement except for the Defendant's person and the area immediately within his reach. Officer Thomas testified that he handed the items he found over to Officer Huddleston and that they left the house and had a discussion, deciding to secure a search warrant for the house.

Officer Thomas waited at the house to make sure no one went inside and destroyed evidence, and he participated in the first part of the search when the other officers returned with a warrant. Officer Thomas testified that the passenger from the car who he detained was later released.

On cross-examination, Officer Thomas testified that he was not present during the initial observations of Officer Huddleston related to the SUV, so he has no personal knowledge of the car on North Illinois Avenue or who was in it. When Officer Thomas pulled up to the house, the occupants of the Dodge Durango were standing outside of the car. Officer Thomas testified that some people who flee the police back their cars in so as to hide their license plate numbers.

When shown the screenshot from the in-car video from Officer Huddleston's first view of the black SUV at the corner of Ivanhoe and North Illinois, Officer Thomas testified that he could not see anyone in the car or who was in the car. Officer Thomas testified that the intersection of Ivanhoe and North Illinois is "sparsely lit," "not unlit," but "not as well lit as some other areas in town" [Doc. 39 at 94].

On redirect examination, Officer Thomas testified that North Illinois Avenue is a generally

well-lit state highway.

### III. FINDINGS OF FACT

The Court finds the following facts to be relevant in addressing the issues presented: Officer Huddleston observed a black SUV driving above the posted speed limit and saw two black individuals inside of the car. The officer recognized the driver, who made eye contact with him and was wearing a flat-billed baseball cap. Officer Huddleston turned onto North Illinois Avenue behind the SUV, and after confirming the car's speed with mobile radar, he turned on his blue lights and siren to initiate a traffic stop of the vehicle for speeding. When the officer attempted to initiate the traffic stop, the driver of the black SUV increased his rate of speed and evaded the officer. Following police department policies and procedures for actively evading vehicles, Officer Huddleston then terminated his pursuit and radioed in the last known location and a general description of the SUV and its occupants.

After a few minutes of several officers searching the area for the SUV and Sergeant Nance suggesting that the officers check Salem Road for the SUV, Officer Huddleston, tailed by Officer Thomas, proceeded to Salem Road. At 132 South Seneca, a house at the corner of Salem Road and South Seneca Road, Officer Huddleston observed what he believed to be the same black SUV with the same occupants preparing to exit the SUV. The SUV was backed into the driveway, with the front end facing the street. Officer Huddleston recognized the same shape, size, and color of the SUV, and the same face and hat of the driver.

Officer Huddleston exited his cruiser and ordered the Defendant, who was already proceeding toward the door to the house, to stop, identifying himself as a police officer, and informing the

Defendant that he was under arrest. The Defendant continued toward the door and did not stop, reaching the porch. Officer Huddleston told the Defendant that he would tase him if he did not stop and when he did not, the officer tased the Defendant. When the taser barbs attached to the Defendant, the door, which may have already been partially open at the time, opened fully, and the Defendant fell down a flight of stairs directly inside the door to the basement with at least one of the barbs still attached to his back. Officer Huddleston followed the Defendant into the basement and placed him under arrest. More than one search of the Defendant's person, a search of the area immediately within the Defendant's control, and searches pursuant to two issued search warrants followed, producing narcotics and firearms.

## IV. ANALYSIS

In his motion [Doc. 9], the Defendant argues that he was improperly seized in violation of his Fourth Amendment rights when the law enforcement officers lacked probable cause and reasonable suspicion to detain him and did so by tasing him. The Defendant contends that any information and evidence gained from the law enforcement officers' illegal entry into his home is fruit of the poisonous tree and was an improper basis for a search warrant. The Government responds [Doc. 19] that the officers had probable cause to arrest the Defendant at the time he was seized and that the officers' entry into the Defendant's house was lawful. The Government concedes that the Defendant was seized when he was tased, but argues that the seizure was a proper warrantless arrest based upon probable cause that the Defendant had committed the Tennessee state law crimes of felony and misdemeanor evading arrest in violation of Tenn. Code Ann. § 39-16-603(b)(1) and 39-16-603(a)(1)(A).

In the Defendant's post-hearing brief [Doc. 40], he argues that Officer Huddleston could not and did not see who was driving the black SUV at the intersection of Ivanhoe and North Illinois and that this fact is the only one relevant to whether he had reasonable suspicion or probable cause to detain the Defendant at his home. The Government contends [Doc. 41] that Officer Huddleston's testimony was both credible and reliable when he testified that he positively identified both the SUV and the Defendant at the Defendant's house. The Government further maintains that the positive identification gave Officer Huddleston probable cause to effect a warrantless arrest of the Defendant for felony evading arrest.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Not every contact between a police officer and a member of the public is a seizure. United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990). "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause."

United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008). A police-citizen encounter does not implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant reasonably to believe that compliance is compelled. United States v. Collis, 766 F.2d 219, 221 (6th Cir.), cert. denied, 474 U.S. 851 (1985). Nor is there any Fourth Amendment implication before a defendant is stopped or searched. United States v. Saucedo, 226 F.3d 782, 789 (6th Cir. 2000).

19

The Court will first consider at what point during the incident the Fourth Amendment was implicated. Next, it will analyze whether the police had reasonable suspicion or probable cause to seize the Defendant at that point.

*(A) Timing of Seizure*

The test for when the individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave. Michigan v. Chesternut, 486 U.S. 567, 573 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010); United States v. Cooke, 915 F.2d 250, 252 (6th Cir. 1990). As noted above, "[a]bsent coercive or intimidating behavior which negates the reasonable belief that compliance is not compelled," an officer's request for identification or information is not a seizure. Collis, 766 F.2d at 221 (holding that officer's request that defendant accompany him to the baggage claim area to retrieve a driver's license was not a seizure). The Supreme Court has enumerated certain factors that can indicate a seizure:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

United States v. Mendenhall, 446 U.S. 544, 554 (1980); Smith 594 F.3d at 536.

In this case, the Court finds that the Defendant was seized when the barbs of Officer Huddleston's taser connected with his person. "A person fleeing from a police officer's show of force is not then under arrest." United States v. Britton, 335 F. A'ppx 571 (6th Cir. 2009) (citing United States v. Williams, 949 F.2d 220, 222 (6th Cir. 1991)). The Defendant was not yet under arrest as he ran toward the door of his house. The Defendant contends, and the Government

concedes, that the Defendant was seized once the taser was deployed and at least partially immobilized the Defendant, sending him tumbling down the stairs to the basement of his house. The Court has no hesitation in finding that the Defendant was seized, and the Fourth Amendment was implicated, when the Defendant was tased by Officer Huddleston on his porch.

The Court must next determine whether the seizure of the Defendant was a permissible one: whether the officers had reasonable suspicion or probable cause to detain the Defendant.

### (B) Reasonableness Under the Fourth Amendment

The Defendant argues that at the time he was seized, the officers lacked both probable cause to arrest him and reasonable suspicion to conduct an investigatory stop. The Government contends that the officers had not just reasonable suspicion, but probable cause, at the point of seizure, and that they lawfully effected a warrantless arrest of the Defendant based upon probable cause that he had committed the Tennessee state law crime of felony evading arrest. Based on the arguments of the parties both at the hearing and in their post-hearing briefs, the Court finds that the disagreement in this case is based almost entirely upon the credibility of Officer Huddleston's testimony. In the Defendant's brief, he asserts that the sole issue is whether "there was probable cause for the officers to go to [the Defendant's] residence,"[2] and contends that "[i]f Officer Huddleston did not see the occupants of the vehicle well enough to make a useful . . . description, then [tasing and seizing the Defendant] was not a legal action" [Doc. 40 at 2].

---

[2]The Government's responsive brief points out that the officers did not need probable cause to drive to the Defendant's residence and that he, thus, incorrectly states the standard. The Court agrees with the Government; however, this improper statement of the issue in this case does not alter the Court's findings or reasoning, given that the Defendant in all other instances argues that the officers did not have probable cause to arrest the Defendant, rather than to go to his house.

Central to the arguments in the instant motion and cited in the Government's response [Doc. 19] is Tenn. Code Ann. § 39-16-603(b)(1), which provides: "It is unlawful for any person, while operating a motor vehicle on any street, road, alley or highway in [Tennessee], to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to being the vehicle to a stop." A violation of that section of the Tennessee Code is a Class E felony. Tenn. Code Ann. § 39-16-603(b)(3). The Government asserts that when Officer Huddleston observed and then confirmed with radar the black SUV, which it maintains was driven by the Defendant, traveling at a speed in excess of the posted speed limit, the officer had probable cause to initiate a traffic stop. See Tenn. Code Ann. § 55-8-152. After the officer engaged his blue lights and siren, the Government contends that the Defendant refused to stop and fled from Officer Huddleston, giving Officer Huddleston probable cause to arrest the Defendant for a violation of Tenn. Code Ann. § 39-16-603(b)(1), when he positively identified the Defendant and his vehicle in his driveway a few minutes later.

Moreover, the Government asserts that Officer Huddleston also had probable cause to arrest the Defendant for misdemeanor evading arrest in violation of Tenn. Code Ann. § 39-16-603(a)(1)(A), when Officer Huddleston arrived at the Defendant's house, positively identified him as the driver of the SUV with which he was involved in a high speed chase, exited his cruiser, identified himself as an officer, and ordered the Defendant to stop and to get on the ground. The Government maintains that the Defendant's disregard of the officer's orders, continuing to move toward the door of his house when he was aware that Officer Huddleston was attempting to arrest him, provided probable cause for the officer to arrest the Defendant for this additional violation.

In the Defendant's post-hearing brief, he argues against a finding that Officer Huddleston had

22

probable cause to arrest the Defendant for felony or misdemeanor evading arrest by attacking the officer's credibility as to his identification of the Defendant outside of his house at the corner of Salem and South Seneca. The Defendant argues that based on the in-car video evidence presented at the hearing, Officer Huddleston was unable to see the occupants of the black SUV as it initially sped by him at the corner of Ivanhoe and North Illinois. This argument is based in part upon Officer Thomas' testimony, when viewing a still of the video after having stated that it is a fair and accurate depiction of the night, that he was unable to tell who, if anyone, was inside the SUV. The Defendant also points to Officer Thomas' testimony that the intersection in question is "sparsely lit" [Doc. 39 at 94], in contrast to Officer Huddleston's testimony that the intersection is well-lit.

Further, the Defendant emphasizes Officer Huddleston's description on the police radio as evidence that he could not have gotten a good look at the individuals in the SUV. The Defendant claims that the officer's radio description of "a black SUV with two black males" inside was too general based on the officer's training to be as descriptive as possible in situations of heightened stress. At the hearing, Officer Huddleston testified that he saw that the driver was wearing a flat-billed cap. The Defendant asserts, however, that the officer did not decide on this description until he saw the Defendant later in the night at his house, because he would have included it in his description on the police radio if he had seen it initially.

The Government responds to the arguments related to Officer Huddleston's credibility that the Defendant's contentions are refuted by the officer's own testimony and that the Defendant has offered no proof to contradict this testimony. The Government highlights aspects of the officer's testimony to show that he indicated that he had in fact gotten a good look at the SUV, but that he was not familiar with the specific make and model, and that he recognized the driver's face, but could

23

not put a face with a name at that moment. The Government asserts that the fact that the officer saw the occupants of the SUV is actually corroborated by his radioed description of two black males in a black SUV, because he would not have been able to tell how many individuals were in the car or the race of those individuals if he had not seen them at all. The Government points out that in response to a question about whether the description he radioed was the best description he could give, Officer Huddleston testified that it was the best description he "got out on the radio" [Doc. 39 at 56]. In doing so, the Government argues that "[t]he level of specificity with which he reported in a heated moment does not necessarily speak to the level of detail he actually perceived" [Doc. 41 at 3]. The Government asserts that the issue the Court should concern itself with is what Officer Huddleston "actually perceived both at the time of the evasion" and when he saw the suspects at the house a few minutes later, rather than what he said over the radio [Id.].

"It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment." Ingram v. City of Columbus, 185 F.3d 579, 592-93 (6th Cir. 1999) (internal citation omitted). An officer may reasonably effect a warrantless arrest under the Fourth Amendment if the arrest is made in public, and probable cause exists to believe that a criminal violation has been or is currently being committed. United States v. Abdi, 463 F.3d 547, 557 (6th Cir. 2006) cert. denied, 127 S. Ct. 2910 (2007) (citing United States v. Watson, 423 U.S. 411, 417-424 (1976)). "Probable cause is defined as reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion." United States v. McClain, 444 F.3d 556, 562 (6th Cir. 2005) (quoting United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993) (en banc)).

The Defendant's motion challenges not that there was probable cause to arrest the driver of

the black SUV initially seen driving on North Illinois, but instead argues that the Government cannot show that the Defendant was the one driving that black SUV and, thus, Officer Huddleston lacked probable cause to arrest him as the driver of the SUV when he arrived at his house a few minutes later. Because the Court finds the testimony of Officer Huddleston to have been credible as to his having recognized and positively identified the Defendant and his car, the Court finds that the officer had probable cause to arrest the Defendant for felony evading arrest when he encountered him outside of the Defendant's residence.

The Court finds that Officer Huddleston had probable cause to arrest the Defendant for a violation of Tenn. Code Ann. § 39-16-603(b)(1), when he saw and positively identified him outside of the house at 132 South Seneca. As stated above, the statute provides that "[i]t is unlawful for any person, while operating a motor vehicle on any . . . highway in [Tennessee], to intentionally flee or attempt to elude any law enforcement officer, after having received any signal from the officer to being the vehicle to a stop." Tenn. Code Ann. § 39-16-603(b)(1). In this case, Officer Huddleston observed the black SUV driving by him at what he knew from his training to be a high rate of speed. After turning onto North Illinois Avenue, Officer Huddleston confirmed by mobile radar that the SUV's speed was fifty-eight miles per hour, well in excess of the posted speed limit of forty miles per hour on the road. After such confirmation, Officer Huddleston turned on his blue lights and attempted to initiate a traffic stop of the vehicle. When the blue lights were turned on, after having previously slammed on his brakes, the driver of the SUV started increasing his speed in what Officer Huddleston believed to be an effort to actively evade him. The SUV continued to speed up and then made a fast turn down Iroquois, at which time Officer Huddleston ceased his pursuit. The Court finds based upon the in-car video and the testimony of Officer Huddleston, that the driver of the

25

SUV received a signal from the officer to stop, in the form of the cruiser's blue lights and siren, and that he intentionally fled from the officer by increasing his speed and making evasive maneuvers. Accordingly, at the point at which Officer Huddleston was pursuing the SUV and it sped up following the initiation of the cruiser's blue lights and siren, Officer Huddleston had probable cause to arrest the driver of the black SUV for felony evading arrest under Tenn. Code Ann. § 39-16-603(b)(1).

Having decided that probable cause existed to arrest the driver of the SUV, the Court must now determine if Officer Huddleston had probable cause to arrest the Defendant as that driver. Officer Huddleston testified that he was able to see the occupants of the SUV when it passed him driving down North Illinois. He testified that the passenger was leaning back, giving him a better view of the driver, who he testified made eye contact with him and was wearing a flat-billed cap. Officer Huddleston testified that he recognized the driver's face but could not remember his name at that point. Through visual demonstration and the testimony of Officer Thomas at the suppression hearing, the Defendant attempted to discredit Officer Huddleston and show that he could not have seen the driver of the SUV at that point. The Defendant likewise urged the Court to find that the radioed description of the car and its occupants was too general to show that Officer Huddleston saw the Defendant inside.

After reviewing the evidence, however, the Court declines to find that the low-quality in-car cruiser video, despite being a fair and accurate representation of the events of the night in question, shows exactly what Officer Huddleston saw in person from his cruiser that night. While the Court recognizes that a still from the moment the SUV drove by the officer does not reveal the identities of the occupants, the Court finds Officer Huddleston credible and notes that the headlights, the

26

darkness of the night at approximately 3:30 a.m., and a possible glare could have contributed to that fact. The Court also declines to find that the fact that Officer Huddleston did not, in the heat of the chase, state over the radio that the driver was wearing a flat-billed cap leads to the conclusion that Officer Huddleston did not in fact see such a cap. Moreover, the Defendant's argument here ignores the fact that in addition to identifying the Defendant as the driver, Officer Huddleston likewise identified the Dodge Durango parked in the Defendant's driveway as the vehicle that had evaded him several minutes before.

When Officer Huddleston arrived at the house at the corner of Salem Road and South Seneca,[3] he saw what he described as a black SUV the "exact same shape, the exact same color, [and] the exact same size" as the SUV that evaded him [Doc. 39 at 29]. His headlights were on and directed toward the SUV, which was parked with the front end facing him, and the dome light inside of the SUV was lit because at least one of the car's doors was open. Officer Huddleston testified that he once again got a good look at driver, that they made eye contact again, and that he was wearing the same flat-billed cap he had seen earlier. Officer Huddleston was certain that this was the same SUV and the same driver. Moreover, by this time, Officer Huddleston had already put together, through his earlier preparations for patrols, information from roll calls, and the statements of other

---

[3]As stated above, at one point in his post-hearing brief, the Defendant makes a statement indicating that Officer Huddleston needed probable cause to go to his residence. The Court finds that the officers did not need probable cause or reasonable suspicion to drive down Salem Road. The Court also finds Sergeant Nance's statement that individuals fleeing the police in Oak Ridge often go to Salem Road, and the fact that the statement likely played a roll in Officer Huddleston proceeding to that road, to be irrelevant. When Officer Huddleston arrived at Salem and South Seneca, he positively identified the SUV and the driver of the vehicle as the ones he had pursued, giving him probable cause to arrest the driver for felony evading arrest.

officers on the radio, that the individual he sought was the Defendant, Undra Davis.

Accordingly, the Court finds that Officer Huddleston had reasonable grounds to believe that the Defendant was engaged in the criminal activity of felony evading arrest in violation of Tennessee law. The facts and information known to Officer Huddleston by the time he positively identified the Defendant were sufficient to allow a prudent person to believe that the Defendant had comitted an offense. See United States v. Smith, 549 F.3d 355, 359 (6th Cir. 2008); see also United States v. Romero, 452 F.3d 610, 615 (6th Cir. 2006) (in determining whether probable cause existed to arrest someone, the court "must determine whether at that moment the facts and circumstances within the arresting officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that [a suspect] had committed or [was] committing an offense."). The Court finds that the credible testimony of Officer Huddleston that he positively identified the Defendant and the SUV has not been rebutted. Based upon the totality of the circumstances, the Court finds that Officer Huddleston had probable cause to effect a warrantless arrest of the Defendant for felony evading arrest when he saw him in public in the driveway, and that he did so arrest him. Because the Court finds that Officer Huddleston had probable cause to arrest the Defendant for felony evading arrest and because the officer testified that he planned to arrest the Defendant for felony evading arrest, the Court need not address the Government's argument that the officer also had probable cause to arrest the Defendant for misdemeanor evading arrest.

The Defendant also summarily argues that "any information gained from the police's illegal entry of the house is fruit of the poisonous tree and an improper basis for any subsequent warrant and so should also be suppressed" [Doc. 34 at 3]. The Government takes this statement to be a brief challenge of Officer Huddleston's entry into the Defendant's home after tasing him as illegal.

Accordingly, the Government responds that the officers' entry into the house was lawful in accordance with United States v. Santana, 427 U.S. 38 (1976), and United States v. Johnson, 488 F.3d 690 (6th Cir. 2007). The Government argues that the officers had probable cause to believe the Defendant had committed a felony, that Officer Huddleston saw the Defendant in a public place (his driveway) and identified him as the driver of the fleeing SUV, that Officer Huddleston shouted and ordered the Defendant to stop, and that the Defendant ignored his commands. The Government contends that under these circumstances, Officer Huddleston was in "hot pursuit" of the Defendant and that the officer could have lawfully entered into the Defendant's home to effect the arrest that started in the public driveway even if the Defendant had not fallen into the house and down the stairs after being tased.

The Defendant's arguments in his post-hearing brief, distinguishing the "hot pursuit" cases of Santana and Johnson from his case on the basis that those cases did not involve issues of probable cause, when "[p]robable cause is the only issue in the instant case[,]" lead the Court to the conclusion that the Defendant's brief statement at the end of his initial motion, indicating that the officers' entry into the house was illegal, referred to the fact that the officers were not permitted to enter because they lacked probable cause to arrest the Defendant, rather than that they were not in "hot pursuit" and, thus, were unable to enter. Based upon the representations of the Defendant, the Court does not find that the Defendant is mounting a challenge to the officers' entry into his house except in the context of the officers entering as a result of the alleged illegal warrantless arrest of the Defendant, without probable cause.

Because the Court finds that probable cause existed to arrest the Defendant for felony evading arrest at the point when he was seized and arrested by Officer Huddleston, the Court finds

that the Defendant's arrest was reasonable under the Fourth Amendment. Accordingly, the Court

finds no basis to suppress the evidence found on the Defendant's person, the evidence found within

the Defendant's immediate control, or the evidence seized pursuant to the search warrants issued

afterward.[4]

## V. CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant

legal authorities, the Court finds no basis to suppress the evidence seized in this case. For the

reasons set forth herein, it is **RECOMMENDED** that the Defendant's Motion to Suppress **[Doc. 34]**

be **DENIED**.[5]

Respectfully submitted,

   s/ C. Clifford Shirley, Jr.   
United States Magistrate Judge

---

[4]The Court notes that the Defendant challenges only his seizure as unreasonable in violation of the Fourth Amendment and has not otherwise challenged any aspect of the search of his person, the area surrounding his person, or the search warrants themselves.

[5]Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).